712 S.E.2d 121 (2011)
In the Interest of T.S. et al., children.
No. A11A0420.
Court of Appeals of Georgia.
June 16, 2011.
*122 Steven Mitchell Harrison., for appellant.
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Sr., Asst. Atty. Gen., Elizabeth M. Williamson, Asst. Atty. Gen., Sarah M. Tipton-Downie, Vidalia, for appellee.
DILLARD, Judge.
The mother of T.S. and J.F. appeals from an order of the Juvenile Court of Dodge County, arguing that the court erred in finding that (1) T.S. was deprived, (2) reunification was not in T.S.'s best interests, and (3) custody of J.F. should be awarded to the boy's father, even after concluding that J.F. was not deprived. For the reasons set forth infra, we affirm in part, reverse in part, vacate in part, and remand the case for further proceedings consistent with this opinion.
In an appeal from a deprivation order, we review the evidence from a juvenile court hearing "in the light most favorable to the court's judgment and determine whether any rational trier of fact could have found by clear and convincing evidence that the children were deprived."[1] So viewed, the evidence shows that in April 2009, the Dodge County Department of Family and Children Services ("DFCS") received a report from the school of then seven-year-old T.S. that the girl had come to school with a mark on the side of her face, which required medical attention. T.S. reported that her mother struck her after becoming upset because she left a book bag at school. When a DFCS investigator interviewed T.S.'s mother about the incident, the mother admitted that she "lost control" and slapped T.S., knocking her to the ground and leaving a "slash" across the child's face.[2] She also admitted to whipping T.S. on the girl's buttocks and legs with a belt. Consequently, T.S.'s mother was arrested on a cruelty-to-children charge, and she later pleaded guilty to a lesser-included misdemeanor of simple battery. Following this incident, DFCS placed T.S. in her paternal grandmother's custody and placed the mother's then four-year-old son, J.F., who had a different father than T.S., in his paternal grandmother's custody.[3] After several *123 months, both children returned to live with their mother.
On October 20, 2009, DFCS received another report from T.S.'s school, noting that when T.S. arrived at school that morning, a teacher noticed that she had pronounced scratch marks on her face and another one on her right wrist, and that T.S. claimed the scratch marks came from being slapped by her mother. When confronted with T.S.'s accusation, the mother admitted to the DFCS investigator that she grabbed T.S. by the face and that her fingernail scratched her daughter's face, but she denied slapping her. Nevertheless, following this incident, DFCS again placed both children in the custody of their respective paternal grandmothers as part of a safety plan.
On April 22, 2010, DFCS filed a deprivation petition as to both T.S. and J.F., which alleged that the mother physically abused T.S. and noted that both children were currently in the custody of their respective paternal grandmothers. Shortly thereafter, J.F.'s father filed a petition for legitimation of J.F. and sought to intervene in the deprivation adjudication.
The juvenile court conducted a hearing on the deprivation petitions and the legitimation petition filed by J.F.'s father on June 10, 2010. During that hearing, the DFCS investigator testified regarding the physical abuse T.S. suffered and the mother's admissions that she inappropriately and excessively disciplined her daughter. Additionally, a clinical psychologistwho was asked by DFCS to provide cognitive behavior therapy and anger-management counseling for the mother after the first reported incident of abusetestified for the State. Specifically, the psychologist testified that the mother acknowledged inappropriately and excessively disciplining T.S. and that the mother was frustrated by the fact that T.S.'s father did not provide any financial or emotional support for his daughter. At the conclusion of these initial counseling sessions, the psychologist recommended that the mother see a psychiatrist in order to determine whether she needed to be treated with antidepressant or mood-stabilizing medications; however, the mother never followed this advice. The psychologist further testified that she was again brought in by DFCS to work with the mother after the second incident of abuse. And while the psychologist acknowledged the mother's progress (as a result of these counseling sessions), she also opined that it was probably not a good idea to return the children to the mother until she was evaluated further by a psychiatrist, who could then determine whether her treatment needed to include antidepressant and mood-stabilizing medications.
During the same hearing, J.F.'s father, who was then serving in the United States Army, testified that he began providing child support for J.F. as soon as he learned that he was the boy's father. J.F.'s father also testified that he wanted custody of the boy and explained to the court that he had successfully requested a transfer to a nearby Army base so that he could be near J.F. while completing his service requirements. J.F.'s paternal grandmother also testified during the hearing, noting that after J.F. came to live with her, his reading and speech skills progressed, and that he seemed very happy. One of J.F.'s teachers also testified during the hearing and confirmed that J.F. had made significant progress in school since he began living with his grandmother.
Finally, the mother of T.S. and J.F. testified during the hearing and acknowledged that in April 2009, she slapped T.S. in the face and whipped her with a belt to the extent that her daughter's buttocks and legs had marks. She also acknowledged that this incident resulted in her arrest on cruelty-to-children charges. With regard to the October 2009 incident, the mother testified that she grabbed T.S.'s face but denied that she intended to cut T.S.'s face with her fingernail. The mother also admitted that after both incidents she agreed to a DFCS safety plan, which placed T.S. and J.F. in the custody of their respective paternal grandmothers and required her to attend counseling and anger-management classes. Additionally, the mother conceded that the psychologist, who counseled her on anger-management issues, recommended that she seek further mental-health counseling so that she could be prescribed antidepressant medication, but *124 explained that she did not agree with this assessment.
At the conclusion of the hearing, the juvenile court found T.S. to be deprived and granted DFCS's request that T.S.'s paternal grandmother have long-term custody with no plan for reunification. The court also found that J.F. was not deprived, but it, nevertheless, placed custody of J.F. with his father after granting the father's legitimation petition. A few months later, the juvenile court confirmed its rulings in a written order. This appeal follows.
1. The mother contends that the juvenile court erred in finding T.S. to be deprived. We disagree.
A deprived child is one who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[4] In determining whether a child is without proper parental care or control, the court shall consider, among other things, "evidence of past egregious conduct of the parent toward the child or toward another child of a[n] . . . emotionally . . . abusive nature" and "evidence of past . . . mental[] or emotional neglect of the child or of another child by the parent."[5] Additionally, "[i]n determining whether a child is deprived, the court focuses on the needs of the child rather than parental fault."[6] Furthermore, "[a] temporary loss of custody on the basis of deprivation is justified only when the deprivation resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[7]
Here, the evidence shows that the mother physically abused T.S. on at least two occasions to the extent that officials at T.S.'s school became concerned for the child's physical and emotional well being.[8] Indeed, the police were notified on one of those occasions, the mother was charged with cruelty to children, and she later pleaded guilty to a charge of misdemeanor simple battery. The evidence also demonstrated that although the mother sought anger-management counseling, the psychologist working with the mother testified that she thought it was unwise to return the children to the mother's custody until and unless she sought further psychiatric counseling. Thus, there was sufficient evidence to support the juvenile court's finding that T.S. was deprived.[9]
2. The mother also contends that the juvenile court erred in finding that reunification was not in T.S.'s best interests. And because the juvenile court's order is insufficient to allow for meaningful appellate review on this issue, we vacate the nonreunification order and remand the case for further proceedings.
It is well established that "[i]n order to determine that reunification is no longer appropriate, a juvenile court must find by clear and convincing evidence that efforts to reunify the child with his [or her] family will be detrimental to the child."[10] And in reviewing such a determination, "we view the evidence in the light most favorable to the *125 trial court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that reasonable efforts to reunify the children with [his or her] parents would be detrimental . . . and therefore reunification services should be terminated."[11] Importantly,
[t]here shall be a presumption that reunification services should not be provided if the court finds by clear and convincing evidence that: (1) [t]he parent has unjustifiably failed to comply with a previously ordered plan designed to reunite the family; (2) [a] child has been removed from the home on at least two previous occasions and reunification services were made available on those occasions; (3) [a]ny of the grounds for terminating parental rights exist, as set forth in subsection (b) of Code Section 15-11-94; or (4) [a]ny of the circumstances set out in paragraph (4) of subsection (a) of this Code section exist, making it unnecessary to provide reasonable efforts to reunify.[12]
Here, the juvenile court found that reunification efforts would be detrimental to T.S., but did not specify which, if any, of the presumptions under OCGA § 15-11-58(h) supported its finding. And under these circumstances, it is simply impossible for us to determine whether the juvenile court's order is supported by clear and convincing evidence. Accordingly, we vacate the juvenile court's order to the extent it held that reunification was not in T.S.'s best interests, and remand the case for further proceedings consistent with this opinion.[13]
Furthermore, we are also constrained to vacate the juvenile court's decision to place T.S. with her paternal grandmother. It is well settled that "[i]n nonreunification cases, the court may enter a custody order placing the children with a willing relative or nonrelative individual who, after study by a person or agency designated by the court, is found to be qualified to receive and care for the children."[14] And while the juvenile court's order noted that T.S.'s paternal grandmother will "provide a family home" for the child and further directs that a probation officer submit a report every 36 months regarding whether the grandmother continues to be qualified to care for T.S., the record is devoid of any evidence that such a report regarding the grandmother's qualifications was submitted prior to the court's custody decision (as required by statute).[15] Accordingly, the juvenile court's award of permanent custody of T.S. to her paternal grandmother is vacated, so that on remand the issue of placement may also be addressed in a manner consistent with this opinion.[16]
3. Finally, the mother contends that the juvenile court erred in awarding custody of J.F. to his father even after finding that J.F. was not deprived. We agree.
This Court has previously noted that "[a]lthough a deprivation proceeding is *126 brought to determine whether the child is deprived and is not an action brought to decide custody matters concerning the child, the juvenile court is authorized to assign temporary custody of a deprived child."[17] Indeed, OCGA § 15-11-55(a)(2) provides that a juvenile court may transfer custody "[i]f the child is found to be deprived. . . ." And while "the juvenile court shall have concurrent jurisdiction to hear and determine the issue of custody and support when the issue is transferred by proper order of the superior court,"[18] no such order exists in the record. Instead, the juvenile court specifically found that J.F. was not deprived. Thus, according to a plain reading of OCGA § 15-11-55(a)(2), the court was without authority to transfer custody of J.F. to his father and paternal grandmother. Accordingly, we reverse the part of the juvenile court's order awarding custody of J.F. to his father and paternal grandmother.
Judgment affirmed in part, reversed in part and vacated in part, and case remanded.
SMITH, P.J., and MIKELL, J., concur.
NOTES
[1] In the Interest of T.W., 297 Ga.App. 886, 886, 678 S.E.2d 546 (2009) (punctuation and footnote omitted).
[2] T.S. required medical attention as a result of this incident of abuse, and there was testimony presented below that the slash mark was still visible on the child's face six months later.
[3] The mother is not married to either child's father.
[4] OCGA § 15-11-2(8)(A).
[5] OCGA § 15-11-94(b)(4)(B)(iv)-(v).
[6] In the Interest of M.K., 288 Ga.App. 71, 71(1), 653 S.E.2d 354 (2007) (citation omitted).
[7] In the Interest of T.W., 297 Ga.App. at 887, 678 S.E.2d 546 (citation and punctuation omitted).
[8] Suffice it to say, there is significant distinction between a parent physically abusing his or her child (as was the case here), and a parent choosing to discipline his or her child by means of reasonable and nonexcessive corporal punishment. The former is impermissible, whereas the latter amounts to constitutionally protected conduct. See, e.g., Doe v. Heck, 327 F.3d 492, 522 (7th Cir.2003) (Manion, J.) (holding that "the fundamental right of parents to direct the upbringing of their children necessarily includes the right to discipline them").
[9] See, e.g., In the Interest of M.K., 288 Ga.App. at 73(1), 653 S.E.2d 354 (holding that evidence that mother physically abused child was sufficient to support deprivation finding); In the Interest of T.R., 284 Ga.App. 742, 743, 644 S.E.2d 880 (2007) (same).
[10] In the Interest of M.H., 251 Ga.App. 528, 529, 554 S.E.2d 616 (2001) (footnote omitted); see OCGA § 15-11-58(h).
[11] In the Interest of A.M., 306 Ga.App. 358, 358-59, 702 S.E.2d 686 (2010) (citation and punctuation omitted).
[12] OCGA § 15-11-58(h)(1)-(4). The following criteria are listed in OCGA § 15-11-58(a)(4): (A) parent has subjected the child to aggravated circumstances, including abandonment, torture, chronic abuse, and sexual abuse; (B) parent has committed murder of another child of the parent; been convicted of murder of the child's other parent; committed voluntary manslaughter of another child of the parent; aided or abetted, attempted, conspired, or solicited to commit murder or voluntary manslaughter of another child of the parent; committed a felony assault that resulted in serious bodily injury to the child or another child of the parent; or (C) the parental rights of the parent to the child's sibling have been terminated involuntarily.
[13] Cf. In the Interest of A.W., 264 Ga.App. 705, 708(3), 592 S.E.2d 177 (2003) (vacating order and remanding case to juvenile court when it was unclear whether juvenile court's order was based on a mistake of fact).
[14] In the Interest of J.J., 287 Ga.App. 746, 749(2), 652 S.E.2d 639; see also OCGA § 15-11-58(i)(1)(A)-(C).
[15] See OCGA § 15-11-58(i)(1)(A).
[16] Cf. In the Interest of J.J., 287 Ga.App. at 749-50(2), 652 S.E.2d 639 (holding that custody of children cannot be placed with foster care agency given the absence in the record of any report as to whether the foster care agency was qualified to care for the children).
[17] Long v. Long, 303 Ga.App. 215, 218(2), 692 S.E.2d 811 (2010) (citation and punctuation omitted) (emphasis supplied).
[18] OCGA § 15-11-28(c)(1).